# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville October 15, 2013

## JARRON DEONTÉ KING v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-854      Mark. J. Fishburn, Judge**

---

**No. M2012-02152-CCA-R3-PC - Filed November 20, 2013**

---

Jarron Deonté King ("the Petitioner") pleaded guilty to one count of second degree murder, two counts of attempted first degree murder, three counts of attempted especially aggravated robbery, and one count of aggravated assault.  Pursuant to the plea agreement, the trial court sentenced the Petitioner to an effective sentence of twenty-seven years' incarceration.  The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing.  The Petitioner now appeals, arguing that he received ineffective assistance of counsel in conjunction with his plea submission hearing and that his plea was constitutionally invalid.  Upon our thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Kara Everett, Nashville, Tennessee, for the appellant, Jarron Deonté King.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Victor S. Johnson III, District Attorney General; and Rob McGuire and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On March 20, 2009, a Davidson County grand jury indicted the Petitioner on one count of first degree felony murder, one count of first degree premeditated murder, two counts of attempted first degree murder, three counts of attempted especially aggravated

robbery, and one count of aggravated assault. The Petitioner proceeded to a jury trial[1] on April 20, 2010. Before the conclusion of the proof in the trial, however, the defense announced that it had reached a plea agreement with the State. The trial court then proceeded into a guilty plea hearing the same day. During trial, the following proof was adduced:

Sergio Camay testified that he was born in Guatemala and had lived in Nashville seven years at the time of trial. On November 21, 2008, he was at a party with Alfredo Sanchez and his brothers. They were drinking beer together at an apartment. A female arrived, whom Camay believed to be a prostitute, and he and several others at the party had sex with her. The female used her phone at some point and then stood at the door until two uninvited individuals arrived. These two men had their faces covered, and each carried a weapon. The men demanded that everyone present place their billfolds and cell phones on a table in the middle of the room. One man did not comply, and one of the masked individuals hit him in the head with his weapon. Someone went to defend the man who had just been hit, and the two masked men "started shooting." These two men were the only people present with weapons, and Camay heard three or four gunshots.

Camay stated that three of his friends were shot during this incident. Alfredo Sanchez was shot in the head. The two masked men and the woman left, and Camay and his friends called police. Camay had $1,800 in cash in his billfold that evening.

On cross-examination, Camay denied using or seeing any drugs that evening. He clarified that the woman also was asking for money when the masked men arrived. At the point that the men started shooting, they had not yet taken the billfolds from the table.

Melvin Sandoval testified that, on November 21, 2008, he lived in an apartment next door to Alfredo Sanchez, the individual who died that night. On that night, he attended a party at Sanchez's apartment. He went inside for "a minute" and then left to buy more beer. When he went inside, he saw a woman talking on her phone and standing at the door. Approximately five minutes after he returned with the beer, two masked men entered the apartment. The woman had opened the door for them. The masked men were carrying handguns, and one of the men held a gun to Sandoval's chin for approximately fifteen to twenty seconds and then hit Sandoval on the head with it. Sandoval was taken to the hospital for his injury and still had a scar at the time of trial. When Sandoval was hit, he fell to the floor and heard two gunshots "when [he] woke up." When he got up, he realized that three others were injured. He stated that the men did not take anything from him. On cross-examination, Sandoval described the masked men as wearing jackets and hoods.

_____

[1] Although the Petitioner was sixteen years old at the time of the commission of these offenses, he was tried as an adult.

-2-

Freddie Aveeno Picon Xavier testified that he attended the party at Sanchez's apartment on November 21, 2008. When a woman arrived, several of the men had sex with her, but Xavier did not. Xavier drank approximately twelve beers that night.

When two masked, black men arrived, Xavier walked between them and went outside. He stated that, when he got outside, "there was another person that came and fired a weapon." He clarified that this person was in addition to the two masked men who entered the apartment. At some point, Xavier was shot in the stomach. He fell to the ground and heard three or four more gunshots. Eventually, Xavier was taken to the hospital where he stayed for five days.

Jose Garcia testified that he attended the party at Sanchez's apartment in November 2008. Garcia, along with several other men there, had sex with a woman who arrived, and he paid her twenty-five dollars for her services. The woman began talking on her phone, and at some point she opened the door for two masked men to enter. These men had "automatic" weapons in their hands. Several of the men there gave up their wallets, but Garcia did not. Garcia heard approximately two gunshots and then saw Sanchez fall to the ground.

After this testimony, the defense notified the trial court that it had reached a plea agreement with the State. Accordingly, a plea hearing commenced. At the plea submission hearing, the State recited the factual basis for the Petitioner's plea as follows:

> [T]he State would incorporate by reference the testimony that's been offered this morning at a jury trial of [the Petitioner] that basically on November 21st, 2008, [the Petitioner] and Edward Shelton entered the apartment of Alfredo Giovanni Sanchez at 1020 Thompson Place, apartment A-16, both were armed. At some point, Mr. Sanchez resisted the robbery attempt and Mr. Shelton shot Mr. Sanchez. [The Petitioner] also fired his weapon during the course of this robbery.
>
> . . . .
>
> [A]fter the police investigation began articles of clothing belonging to Amber Watts, also known as Holly Long, were recovered from the apartment, she was apprehended, she gave a statement to police implicating both [the Petitioner] and Mr. Shelton and another defendant, Jermaine Jenkins, both Mr. Shelton and [the Petitioner] were asked to come to the police station, Mr. Shelton came voluntarily, [the Petitioner] was actually arrested on a juvenile failure to appear, [the Petitioner] gave a statement where he placed himself at 1020 Thompson Place, admitted that he was armed, although at the time he gave the

statement to the police he denied knowing that it was going to be a robbery when it occurred.

The Petitioner, at the plea hearing, confirmed that he knew how to read and write. He denied being under the influence of drugs or alcohol. When asked whether he was suffering or had suffered from any mental illness, the Petitioner stated that he had anger issues but was not prescribed medication for those issues. He denied having taken medication for any type of mental or emotional issue or having any reason that he would not be able to fully understand his decision to plead guilty.

The Petitioner agreed that he had read his plea petition and that his counsel ("trial counsel") had answered adequately any questions that he had. He agreed that he understood the charges against him as well as the contents of his plea petition. Additionally, he agreed that he understood the State's burden of proof should he have chosen to proceed with the trial. He confirmed his understanding of the charges to which he was pleading guilty as well as the sentence he would receive of twenty-seven years' incarceration. The trial court asked the Petitioner why he decided "all of a sudden" to plead guilty. The Petitioner responded, "If I did – I get found guilty, I would get life."

The Petitioner agreed that trial counsel and his other attorney ("co-counsel") had explained to him the law in this case as well as possible defenses. Additionally, he confirmed that his counsel had answered all of his questions satisfactorily and denied having any complaints regarding his counsel. He understood that, by pleading guilty, he was waiving his rights to a jury trial; to call witnesses and cross-examine the State's witnesses; to testify or not testify at the trial; and to appeal the verdict and resulting sentence if the jury were to find him guilty. He also understood that he was pleading guilty to felonies which could be used to enhance his sentence in a future felony case. The Petitioner denied that anyone threatened him or was promising him anything other than the stipulations of the plea agreement.

The trial court entered judgments on the Petitioner's guilty plea for one count of second degree murder, two counts of attempted first degree murder, three counts of attempted especially aggravated robbery, and one count of aggravated assault. According to the Petitioner's plea agreement, the trial court sentenced the Petitioner to twenty-seven years for his second degree murder conviction,[2] fifteen years for each attempted first degree murder conviction, eight years for each attempted especially aggravated robbery conviction, and three years for his aggravated assault conviction, all to be served concurrently, for a total effective sentence of twenty-seven years' incarceration. The trial court entered the judgments against the Petitioner reflecting the terms of the agreement. The Petitioner

---

[2] The Petitioner agreed to a sentence outside of his statutory range.

subsequently filed for post-conviction relief alleging ineffective assistance of counsel and asserting that his plea was constitutionally invalid.

At the post-conviction hearing, trial counsel testified that he met with the Petitioner approximately "three [times] at the jail and several times at court." He agreed that the Petitioner was approximately sixteen years old at the time the offenses occurred. He believed that the Petitioner was in ninth grade, which he surmised could indicate that the Petitioner had had some difficulties in school. Trial counsel testified, "[The Petitioner] spoke pretty well with me, so I didn't pick up on any kind of, he had a mental issues [sic] or anything like that or he seemed slow. He seemed like a kid of his age."

Trial counsel discussed the State's discovery in the case with the Petitioner, and he believed that the Petitioner received a copy of the discovery shortly before trial. At some point, the Petitioner told trial counsel that he did not want to participate in the crime, so trial counsel intended to use this theory at trial. Trial counsel believed that the Petitioner understood this theory. He explained the process of a jury trial to the Petitioner and his trial strategy for the case.

Although the trial originally was set for April 5, 2010, the defense and State agreed to continue the trial to April 19, 2010. Trial counsel believed that the Petitioner learned about this change through his mother. He estimated that he visited the Petitioner twice between April 5 and April 19. He acknowledged that he may have had three other trials set for April 19, 2010, but he stated, "I think the Judges got together and they cleared out which one, since this was going to be priority case, I didn't prepare for any other trials accept [sic] for this one that weekend."

As to whether trial counsel believed this case had suppression issues, he testified,

[B]asically the interrogation, the suppression issue that I thought I was going to have, once I did the research, it didn't seem like it would be viable because I was hoping to suppress the statement based on the fact that he was a juvenile, but the case law didn't support what my theory was.

Trial counsel could not recall whether he asked the Petitioner about the Petitioner's understanding of his Miranda rights.

The Petitioner's family hired co-counsel at some point prior to trial. Trial counsel stated that he and co-counsel had different case theories, but he met with her approximately four or five times in the two to three weeks leading up to trial. In that time, the two of them were able to agree on a trial strategy. Trial counsel believed that the Petitioner understood the agreed-upon trial strategy.

During the trial, the Petitioner told trial counsel that he wanted to discuss settling the case. According to trial counsel, the Petitioner seemed scared. Trial counsel believed that the Petitioner understood the State's burden of proof and did not recall the Petitioner's having any questions regarding the elements of the offenses. Trial counsel confirmed that he reviewed the plea petition with the Petitioner and that he answered the Petitioner's questions. He believed that the Petitioner entered into the plea knowingly and voluntarily.

On cross-examination, trial counsel agreed that, given the testimony presented at trial about two masked gunmen and the fact that none of the witnesses mentioned a gunman being "not with the program," it would have been difficult to establish a "renunciation or withdraw defense." Furthermore, trial counsel confirmed that, in his cross-examination of the witnesses at trial, the witnesses indicated "that both the gunmen seemed equally interested in the robbery that was taking place." Trial counsel also was aware of the other State's witnesses yet to testify, including the Petitioner's accomplice and the prostitute, both of whom would have identified the Petitioner as one of the participants in the robbery. Moreover, the State's evidence included the Petitioner's statement, in which the Petitioner admitted to being armed and masked but denied knowing that a robbery would be committed. The Petitioner would have been the only witness to claim his renunciation or withdrawal. Given the amount of evidence against the Petitioner, trial counsel believed it would be "very unlikely" that the Petitioner would have been acquitted had he proceeded with the trial. Trial counsel surmised that the possibility of serving a life sentence influenced the Petitioner to plead guilty in exchange for a sentence of twenty-seven years.

Phoebe Green, the Petitioner's mother, testified that the Petitioner was sixteen at the time of these offenses. The Petitioner was in the ninth grade at an alternative school at the time because "[h]e was having issues at school with special needs and evaluation like not being able to understand what was going on and stuff and kids was [sic] picking with him because he was in special ed classes over there." According to Green, the Petitioner had been held back in first and ninth grades because of a "[l]earning disability . . . he couldn't understand what was going on in some of the stuff that he was being taught."

Green confirmed that the Petitioner had difficulty understanding directions and certain concepts. The Petitioner went to Centerstone for "behaviors, behavior problem, learning, not being able to understand what, you know, different things and they wanted to try to evaluate . . . him."

Green hired trial counsel to represent the Petitioner in this case. She explained these issues to trial counsel, and trial counsel did not ask her any further questions regarding these issues. She tried to contact trial counsel several times prior to trial, but his office would return her calls "a week or two later." Although she understood that trial counsel did not

have to communicate with her, she was concerned that trial counsel was not communicating enough with the Petitioner for the Petitioner to fully understand the case.

Green stated that she hired co-counsel because she felt that the Petitioner "wasn't getting enough attention" from trial counsel. Co-counsel asked Green to bring clothes to the Petitioner for his trial.

The Petitioner testified that, at the time of these offenses, he was sixteen years old and attending special education classes. He agreed that sometimes he had trouble reading and following directions. He also had behavioral problems because "school was hard" for him.

The Petitioner estimated that trial counsel came to see him three or four times prior to trial. Each of those visits lasted approximately thirty minutes. The Petitioner stated that he was not given the opportunity to review the discovery in his case until a couple of weeks before trial. Co-counsel provided him with a copy of the discovery.

Trial counsel and co-counsel spoke with the Petitioner about their differing strategies regarding his case, which confused the Petitioner. The Petitioner asked trial counsel questions for clarification, but he did not feel that trial counsel answered his questions in a way that he could understand. The Petitioner did not remember trial counsel ever asking him questions regarding his education or mental health.

The Petitioner acknowledged that he knew when to ask questions and was able to ask trial counsel questions when he did not understand something. He denied that trial counsel ever spoke with him regarding his Miranda rights related to his questioning by police. He stated that trial counsel never explained to him the State's burden of proof in his case. However, the Petitioner acknowledged that trial counsel explained the term "beyond a reasonable doubt" and the elements required to constitute a certain crime. The Petitioner believed he had a clear understanding of what his charges were. He denied hearing trial counsel explain concepts of abandonment or withdrawal but confirmed that trial counsel explained to him trial counsel's trial strategy and plan to defend the Petitioner.

The Petitioner suggested potential witnesses to trial counsel, but, according to the Petitioner, trial counsel never investigated these witnesses. The Petitioner attempted to contact trial counsel by telephone and letters, but trial counsel never responded. He believed that co-counsel was able to give him a total understanding of his case in a way that trial counsel did not.

In the first instance in which the Petitioner's case was continued, he did not know that it had been continued until he arrived to court. He had not seen trial counsel in the prior week.

The Petitioner denied that trial counsel explained that going to trial would allow the Petitioner to appeal his verdict. Rather, the majority of the Petitioner's conversations with trial counsel consisted of trial counsel "trying to get [the Petitioner] to sign a plea."

The Petitioner understood that, if he were successful in this post-conviction proceeding, he would be tried again for felony murder with a potential sentence of fifty-one years. Nevertheless, he stated, "I think I got a better chance with another lawyer, [trial counsel] wasn't prepared to go to trial." The Petitioner did not want to plead guilty in this case, but he thought that he would receive a lesser sentence than if he continued with trial at that time. Because he did not feel that he made an informed decision, however, he wished to have a new trial on his original charges.

On cross-examination, the Petitioner stated that the witnesses he wanted trial counsel to call would have testified that he was intoxicated and under the influence of "pills" at the time these offenses were committed.[3] He denied ever hearing that intoxication would not be a defense to felony murder.

The Petitioner testified that he, in fact, did not get out of the car during the robbery. He acknowledged hearing the witnesses at trial say that they saw two gunmen, but he did not know who the second gunman was.

He acknowledged telling the trial court during his plea hearing that he had no problems with trial counsel. The Petitioner stated, however, that he said that because he did not know how to tell the trial court about his issues with trial counsel and was "mad at the moment" that he was accepting the guilty plea. He acknowledged telling the trial court that he had changed his mind and decided to plead guilty because he did not want to receive a life sentence. At the post-conviction hearing, however, he believed that, had trial counsel been more prepared for trial, he would not have received a life sentence at trial. He stated that he might get a better offer from the State if his charges were reinstated. The State asked if knowing that the State would not give him a better offer changed his decision about going forward in this post-conviction proceeding, and the Petitioner stated, "No."

The Petitioner confirmed to the post-conviction court that he had informed trial counsel that his statement to police was a lie. He stated that co-counsel wished to proceed with trial, but, despite the fact that he trusted co-counsel over trial counsel, he accepted trial counsel's advice to plead guilty because he was confused.

The post-conviction court took the matter under advisement and issued a written order denying post-conviction relief. Regarding the Petitioner's ineffective assistance of counsel

---

[3] The Petitioner did not call any of these witnesses to testify at the post-conviction hearing.

claims, the post-conviction court held that none of his claims regarding trial counsel's deficiencies rose to the level of ineffective assistance because the Petitioner had failed to establish "how he was prejudiced . . . or that he would have insisted upon a trial but for th[ese] deficienc[ies]." Accordingly, the post-conviction court denied relief, and the Petitioner timely appealed. On appeal, the Petitioner argues that he received ineffective assistance of counsel and that his plea was constitutionally invalid.

## Analysis

### *Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

### *Ineffective Assistance of Counsel*

The Petitioner argues on appeal that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[4] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable

---

[4] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

under Tennessee's Post-Conviction Procedure Act. <u>See</u> Tenn. Code Ann. § 40-30-103; <u>Pylant</u>, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. <u>See</u> <u>Strickland</u>, 466 U.S. at 687; <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. <u>Goad</u>, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. <u>Id.</u>

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" <u>Vaughn v. State</u>, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting <u>Strickland</u>, 466 U.S. at 688)). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

<u>Baxter</u>, 523 S.W.2d at 934-35 (quoting <u>Beasley v. United States</u>, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." <u>Howell v. State</u>, 185 S.W.3d 319, 326 (Tenn. 2006) (citing <u>Strickland</u>, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" <u>State v. Honeycutt</u>, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting <u>Strickland</u>, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. <u>Rhoden v. State</u>, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." <u>Cooper v. State</u>, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." <u>Vaughn</u>,

202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). In the context of a guilty plea, our analysis of this prong

> focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011).

The Petitioner first argues that trial counsel failed to investigate his mental health. He claims that trial counsel "ignored the notion that the [Petitioner] had a potentially viable health defense." The Petitioner also contends that trial counsel failed to communicate with the Petitioner. Finally, the Petitioner asserts that trial counsel was not prepared for trial. In its order denying the relief, the post-conviction court stated,

> By his own admission, trial counsel was deficient in not communicating with Petitioner more frequently than he did. This is particularly true in light of Petitioner's age, hi[s] mental limitations, and the seriousness of the charges against him. Nevertheless, the Petitioner has failed to show how he was prejudiced by this deficiency or that he would have insisted upon a trial but for this deficiency. Whatever shortcomings there may have been in the amount of communication between Petitioner and [trial counsel] was clearly overshadowed by the quality of those communications and the additional communications between Petitioner and [co-counsel]. . . .

> . . . .

> Petitioner also asserts that [trial counsel] failed to adequately investigate his mental state to determine the viability of an affirmative defense or to negate the required mental state for the offense charged. Petitioner and his mother presented testimony that he had a learning disability preventing him from advancing grades during his schooling. His mother also testified that her son had difficulty understanding basic concepts and required detailed instructions and guidance in order to comprehend certain things. Finally, petitioner offered the names of several witnesses who would testify as to his excessive drug use on the day of the crimes.

While all of this evidence may have been relevant, none of it established by clear and convincing evidence that, if presented, it would have resulted in Petitioner rejecting the State's offer in favor of a trial. The fact remains that Petitioner, despite the advice of his trusted attorney to the contrary, [co-counsel], chose to mitigate his possible punishment and accepted the State's offer. Although Petitioner claims he did so because [trial counsel] was not prepared, he openly admits that he had confidence in [co-counsel]'s ability. That contradiction in Petitioner's testimony negates his argument that he was forced to plead guilty because his lawyers were not prepared.

We agree with the post-conviction court that the Petitioner has failed to establish that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." See Hill, 474 U.S. at 59. At the Petitioner's plea submission hearing, the Petitioner had the following colloquy with the trial court:

Court: Do you have any complaints whatsoever regarding the representation your lawyers have provided you in your case?

Petitioner: Can you explain?

Court: Is there anything that your lawyers haven't done that you think they should've done? Have they – are you pleading guilty because you don't believe that your attorneys are any good, anything about your attorneys that you want to complain about or say anything about?

Petitioner: No, sir.

Additionally, at the post-conviction hearing, the Petitioner testified that co-counsel was able to give him a total understanding of his case, even though he felt that trial counsel did not. Furthermore, the Petitioner stated at the post-conviction hearing that, by reinstating his charges, he might get a better plea offer from the State, which indicates that, even at the time of the post-conviction hearing, he was not insistent upon going to trial. Rather, consistent with his decision to plead guilty during his trial, the Petitioner remained focused on minimizing his sentence. Thus, the Petitioner has failed to establish that trial counsel's performance, even if deficient, prejudiced him. Therefore, we need not address the deficiency prong. See Goad, 938 S.W.2d at 370. Accordingly, he is entitled to no relief on his ineffective assistance of counsel claim.

*Validity of the Plea*

The Petitioner also asserts that his plea was constitutionally invalid. Although his appellate brief lacks any argument or supporting case law regarding this issue, the Petitioner testified at the post-conviction hearing that he did not feel that he made an informed decision to plead guilty and that he accepted trial counsel's advice to plead guilty because he was confused. Although minimal, this proof is some support for the Petitioner's claim that his plea was invalid because it was not made knowingly and intelligently. Accordingly, we will consider the validity of the Petitioner's plea.

To be valid, a plea must be entered knowingly, voluntarily, and intelligently. See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977) superseded on other grounds by Tenn. R. of Crim. P. 37(b) and Tenn. R. of App. P. 3(b). A plea meets constitutional muster when the defendant understands both what the plea connotes and its consequences, Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (citing Boykin, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty, Jaco v. State, 120 S.W.3d 828, 831 (Tenn. 2003) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). In Mackey, 553 S.W.2d at 341, our supreme court set forth the procedure that a trial court should follow when accepting a plea in order to ensure that a defendant's plea is knowing, voluntary, and intelligent. See also Tenn. R. Crim. P. 11(b). A trial court must "substantially" comply with this procedure. State v. Newsome, 778 S.W.2d 34, 38 (Tenn. 1989).

The Petitioner presented testimony at the post-conviction hearing regarding his difficulties in school. His mother testified that the Petitioner attended an alternative school, and, although he was sixteen at the time of the offenses, he was only in the ninth grade. She stated that the Petitioner had been held back because of a "[l]earning disability . . . he couldn't understand what was going on in some of the stuff that he was being taught." However, the Petitioner acknowledged at the post-conviction hearing that, at the time of trial and his guilty plea submission, he had a clear understanding of what his charges were. Additionally, trial counsel testified that he reviewed the plea petition with the Petitioner and answered the Petitioner's questions prior to the Petitioner's entering his plea.

Moreover, we have reviewed the transcript of the guilty plea hearing and conclude that the Petitioner's plea was constitutionally sound. When the Petitioner was asked at the guilty plea hearing whether he had suffered or was suffering from a mental illness, he stated that he had anger issues but did not take medication for it or any other mental or emotional problem. Also at the hearing, the Petitioner acknowledged that he understood: the nature of the charges for which he was pleading guilty and the potential sentencing ranges; his right to representation by counsel at trial; his right to a jury trial, in which he could cross-examine the State's witnesses and he could but would not be forced to testify; his right to an appeal;

and that these felony convictions could be used against the Petitioner in future proceedings to enhance his sentence in a future felony case. The Petitioner also denied that anyone threatened him or that anyone promised him anything other than what was included in the plea agreement. When asked why he was pleading guilty, the Petitioner responded that he wished to avoid a life sentence. The Petitioner's testimony at the post-conviction hearing established that the Petitioner's primary concern remained the length of his sentence, not that he failed to understand his guilty plea. The Petitioner has failed to establish that he did not knowingly, intelligently, and voluntarily enter into his plea agreement. Accordingly, the Petitioner is not entitled to post-conviction relief on this basis.

## CONCLUSION

For the foregoing reasons, the Petitioner has failed to establish that he is entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE